**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CESAR VELAZQUEZ, :<br>:<br>          Plaintiff, :<br>:<br>     v. :<br>:<br>DONNA ZICKEFOOSE, et al., :<br>:<br>          Defendants. :<br>: | Civil No. 11-2459 (RMB)<br><br>**OPINION** |

**APPEARANCES:**

    CESAR VELAZQUEZ, #10272-067
    FCI Fort Dix
    P.O. Box 2000
    Fort Dix, NJ 08640
    Plaintiff Pro Se

**BUMB**, District Judge

    Cesar Velazquez, an inmate who is confined at FCI Fort Dix, filed a paid Complaint against the Warden and several other officials at FCI Fort Dix. This Court has screened the Complaint for dismissal, as required by 28 U.S.C. § 1915A, and, for the reasons set forth below, will dismiss the Complaint, without prejudice to the filing of an amended complaint.[1]

---

[1] Plaintiff should note that once an amended complaint is filed, the original complaint no longer performs any function in the case and "cannot be utilized to cure defects in the amended [complaint], unless the relevant portion is specifically incorporated in the new [complaint]. 6 Wright, Miller & Kane, Federal Practice and Procedure:  Civil 2d § 1476 (1990) (footnotes omitted).  An amended complaint may adopt some or all of the allegations in the original complaint, but the identification of the particular allegations to be adopted must
(continued...)

## I.  BACKGROUND

Plaintiff brings this action pursuant to <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).  The named defendants are FCI Fort Dix Warden Donna Zickefoose; Associate Warden Jacqueline B. Nichols; Captain Janel Fitzgerald; Special Investigative Agent D. Adams; former Unit Manager, Jennifer Knox; and Counselor Battiste.  Plaintiff's submissions consist of a Complaint, Plaintiff's affidavit, administrative decisions, and Inmate Investigative Report of Disruption of Normal Operations East Side Housing Units 5703, 5711, & 5702, at FCI Fort Dix, dated March 2010.  This Court will construe the Complaint as incorporating Plaintiff's affidavit and the attached documents.  (Dkt. 1.)  So construed, Plaintiff's Complaint sets forth the following factual allegations.

Plaintiff began serving a 240-month sentence imposed for conspiracy to distribute cocaine on June 5, 2001.  From June 5, 2001, until January 20, 2009, Plaintiff was confined at FCI McKean.  On January 20, 2009, he arrived at FCI Fort Dix, a lower security institution, and officials placed him in general population Unit 5702.  In March 2009, officials allegedly placed

---

[1](...continued)
be clear and explicit.  <u>Id.</u>  To avoid confusion, this Court instructs Plaintiff to file an amended complaint that is complete in and of itself.  Plaintiff may attach documents to the amended complaint, but all factual allegations regarding the liability of each defendant must be set forth in the amended complaint.

him in the Special Housing Unit ("SHU") to investigate his potential involvement in a gang-related fight.  (Dkt. 1 at 46-52.)  Plaintiff alleges that his mother frequently telephoned Unit Manager Jennifer Knox, "[b]ut, after awhile Ms. Knox had become so annoyed and furious by the calls that she rebuked me because of them.  Ms. Knox had denounced the calls and even denied them.  She had, thus, personally become filled with disgust and rage toward me that it became unbearable for me to handle any of my affairs with the Unit Team."  (Dkt. 1 at 47.)  Plaintiff asserts that officials discharged him from the SHU after one month without a hearing or any finding that he had been involved in the gang fight.  Id.

The Investigative Report states that in early December 2009, "the entire Fort Dix inmate population was notified in writing and via town hall meeting that due to the unprecedented amount of contraband (most notably, cell phones and tobacco) recovered throughout the institution, unit-wide restrictions would be enforced on a progressive basis when contraband was recovered."  (Dkt. 1 at 30.)  The report states that by January 22, 2010, Unit 5703 had reached Level 4 of the unit-wide restrictions due to the recovery of cell phones and other contraband on the unit; on January 26, 2010, inmates in Unit 5703 activated multiple pull-station fire alarms in the housing unit, disrupting normal operations.  Id. at 31.  After a mass shakedown, five cell phones

and six chargers were recovered from Unit 5703 and several inmates were placed in the SHU. Id. The next day, 315 inmates at the satellite camp boycotted the noon meal and at least 42 inmates were identified for placement in the SHU pending transfer to MDC Brooklyn. Id. at 32. On January 28, 2010, inmates activated fire alarm pull-stations in Units 5702 (Plaintiff's Unit), 5703 and 5711; well over 100 inmates from these units were sent to SHU by February 3, 2010. Id. at 33-35. "[T]o relieve overcrowding in the SHU," hundreds of inmates were bussed to FMC Devens, MA, and MDC Brooklyn. Id. at 35-36. The report states that over 700 inmates housed in Units 5702, 5703, and 5711 were interviewed:

> The tone of the information gathered was consistent - inmates were dissatisfied with the unit-wide restrictions imposed following contraband recoveries. Many inmates stated they felt the restrictions were "unfair" and that it was unjust to penalize all inmates for the actions of a few. Over 700 inmates were interviewed and all were afforded the opportunity to identify individuals responsible for the introduction of contraband and/or the repeated activation of the fire alarms. Few offered information of any specificity or of use. Those inmates identified by one or more sources (inmate or staff) as being involved in either contraband trafficking or disruptive activity were placed in the SHU. Also placed in the SHU were inmates who boisterously resisted the interview or shakedown processes.
>
> A significant number of inmates interviewed suggested the disruptive activities occurring in Units 5702, 5703, and 5711 were a coordinated effort. It was further suggested

4

> that after the initial fire alarms were
> activated in Unit 5703 on Tuesday, January
> 26, 2010, Units 5702 and 5711 were to follow
> suit.  No explanation as to why they did not
> was offered; however, the subsequent
> activation of numerous false fire alarms in
> those two units later in the week lends
> credence to existence of an organized plot
> intended to interrupt normal operations.

(Dkt. 1 at 36.)

Plaintiff asserts in his affidavit that in the early morning hours on February 3, 2010, armed officials raided Plaintiff's room (222), handcuffed Plaintiff, escorted him onto a bus, and placed him in the SHU.  (Dkt. 1 at 48.)  Plaintiff alleges that he remained in the SHU at FCI Fort Dix for two weeks, where he slept on a bare floor without bedding in the middle of February in a room without heat.  He alleges that

> the Warden, Captain, Unit Team members and an
> entourage of others made their rounds to the
> SHU.  While there, the Captain . . .
> approached my cell.  As she did, I asked the
> Captain concerning my situation and whether
> there was a Detention Order because I had not
> received one.  I then stated that I must be
> released into general population without a
> "Lock-Up Order" and that I shouldn't be
> punished because I would not
> "inform"/cooperate.  The Captain refused to
> answer any of my questions and basically
> refused to speak to me.  The others touring
> the SHU, aware of my ranting, simply avoided
> my cell.

(Dkt. 1 at 49.)

Plaintiff asserts that on February 18, 2010, officials transported him to MDC Brooklyn and housed him

5

in 5 South "The Old Building" for residence. Officially, the housing in 5 South had been declared condemned and unlivable.  The building contained asbestos and lead paint. The lights remained on 24 hours a day and the units were overcrowded with 120 inmates on an open dorm floor.

The Unit remained unsanitary; very dirty with only two toilets for the 120 inmates.  I was given a bed roll that contained sheets and clothing which were soiled with dirt and bodily fluids.  I was not provided eating utensils for almost 2 weeks.  I had to eat with my hands not to mention the food being horribly bad and insufficient in portions/calorie intake.  I even cracked a tooth on a piece of hard rice.

   *     *     *

I was deprived of visitation.  My family attempted a visitation for their first time while I was in MDC Brooklyn but, was forced to turn around because they were told I wasn't there . . .

I was deprived of medical attention.  While in MDC Brooklyn, I was diagnosed with high blood pressure due to the incident of the kidnapping by Bureau of Prison officials.  I had a constant nose bleed.  I had also been scheduled for a follow-up eye exam before I left FCI Fort Dix but cold not have the exam because of my departure.  The exam was delayed and during which I was experiencing exceeding pain.  I had fluid build up in my eye and a bump behind the retina . . .

I was also deprived recreation.  I had no ability or means for which to achieve recreation.  I was housed in an enclosed environment without fresh air or sunlight. There was no where to walk or run.  I could not perform even calisthenics due to the overcrowded facility.  But, if I could, a low calorie diet, designed for sedentary persons, would not have allowed me to do much.

> In was in addition deprived of sleep0.  I could not sleep in a room crowded with 120 inmates who, half of them, were up all night making loud noises and disturbing the peace.  I could not sleep in a rat and insect infested environment not knowing whether I would be harmed.  I also could not sleep in an environment where the lights remained on at high intensity 24 hours a day and seven days a week.  I've suffered much stress and anxieties due to lack of sleep.  And, I suffered with the additional strain my eyes had to go through which made my eye condition much worse.
>
> I had to deal with all of these hardships for approximately five months until July 7, 2010 when I was able to return to Fort Dix's general population.

(Dkt. 1 at 49-51.)

Plaintiff further asserts that he was deprived of his personal property while he was confined at MDC Brooklyn, and, when he got back to FCI Fort Dix on July 7, 2010, his personal property was missing.

Plaintiff asserts that on March 25, 2010, he submitted an administrative remedy to the Warden of MDC Brooklyn.  (Dkt. 1 at 22-23.)  On May 11, 2010, Warden Duke Terrell denied administrative relief:

> A review of your case reveals, on or about January 25, 2010, a group of inmates at FCI Fort Dix attempted to disrupt the institution's activities.  As a result, the Disturbance Control Team was activated and you were escorted to the Special Housing pending further investigation.  On February 3, 2010, you were transferred to MDC Brooklyn, New York, from FCI Fort Dix, New

> Jersey, to alleviate overcrowding in their Special Housing Unit.
>
> You received no disciplinary infraction regarding the incident, therefore, alleging a violation of due process is unfounded . . .
>
> In regards to your statement about losing weight and having increased blood pressure, you were seen in the Health Services Department on March 12, 2010.  Medical records indicate that you expressed no medical concerns at that time, and you were advised to return to sick call if any medical symptoms should arise.
>
> Finally, MDC Brooklyn is an Administrative facility, and does not make any determination regarding any inmate's specific designation.

(Dkt. 1 at 23.)

The Regional Director denied Plaintiff's appeal on July 9, 2010, and on January 25, 2011, Harrell Watts, Administrator of National Inmate Appeals denied the final administrative appeal:

> Our review of the matter reveals the Warden and the Regional Director adequately responded to this issue.  You arrived at Fort Dix in January 2009, as a result of a lesser security transfer.  You were notified that you were placed in the Special Housing Unit there in February 2010, as a result of an open investigation.  During the pendency of this investigation, you were temporarily transferred to the Metropolitan Detention Center in Brooklyn, New York.  Once the investigation closed, you were transferred back to FCI Fort Dix in July 2010.  In this appeal, you present no evidence showing that you have been violated in any way, or that staff have acted contrary to Bureau of Prisons policy.  You are encouraged to dialogue with your Unit Team.  If you have safety concerns, inform your Unit Team.

(Dkt. 1 at 27.)

Plaintiff maintains that defendants "did knowingly and intentionally conspire to invidiously discriminate and to deprive Cesar Velazquez equal protection of the laws . . . by Administratively Detaining him;" "did knowingly and intentionally without notice and hearing cause the deprivation of property, punishment, and atypical hardship of Cesar Velazquez leading up to and during his Administrative Detention due to his failure to 'inform'/cooperate during an investigation of regulation violations without Due Process of Law;" "did knowingly and intentionally without authority/order and with deliberate indifference cause the cruel and unusual punishment of Cesar Velazquez leading up to and during his Administrative Detention due to his failure to 'inform'/cooperate during an investigation of regulation violations."  (Dkt. 1 at 14-17.)  He seeks declaratory relief, injunctive relief, and damages for violation of his constitutional rights.

## II.  STANDARD FOR DISMISSAL

The Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (April 26, 1996), requires the Court to review a complaint in a civil action in which a prisoner seeks redress against a governmental employee or entity.  See 28 U.S.C. § 1915A(a).  The PLRA requires the Court to sua sponte dismiss any claim if the Court determines that it

is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.  See 28 U.S.C. § 1915A(b).  A claim is frivolous if it "lacks even an arguable basis in law" or its factual allegations describe "fantastic or delusional scenarios." Neitzke v. Williams, 490 U.S. 319, 328 (1989); see also Roman v. Jeffes, 904 F.2d 192, 194 (3d Cir. 1990).

Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), hammered the "final nail-in-the-coffin" for the "no set of facts" standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957),[2] which was previously applied to determine if a federal complaint stated a claim.  See Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009).  To survive dismissal under Iqbal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " Iqbal, 129 S. Ct. at 1949 (citation omitted).  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely

---

[2] The Conley court held that a district court was permitted to dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. at 45-46.

10

consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief", and will be dismissed. Id. (citations and internal quotation marks omitted).

The Third Circuit instructs that, to determine the sufficiency of a complaint under the pleading regime established by Iqbal,

> a court must take three steps: First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Iqbal, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Id.

Santiago v. Warminster Township, 629 F. 3d 121, 130 (3d Cir. 2010); see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-211 (3d Cir. 2009) ("a complaint must do *more than allege the plaintiff's entitlement to relief*. A complaint has to "show" such an entitlement with its facts") (emphasis supplied). The Court is mindful, however, that the sufficiency of this pro se pleading must be construed liberally in favor of the plaintiff, even after Iqbal. See Erickson v. Pardus, 551 U.S. 89 (2007).

### III. DISCUSSION

A court's initial task is to "tak[e] note of the elements [Plaintiff] must plead" in order to state a claim of liability.

11

See Iqbal, 129 S Ct. at 1947-48.  In Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights."  Correctional Services Corp. v. Malesko, 534 U.S. 61, 66 (2001).  The Supreme Court found an implied damages remedy available under the Fourth Amendment.  Bivens, 403 U.S. at 397.  The Supreme Court has recognized an implied damages remedy under the Due Process clause of the Fifth Amendment, Davis v. Passman, 442 U.S. 228 (1979), and the Cruel and Unusual Punishment clause of the Eighth Amendment, Carlson v. Green, 446 U.S. 14 (1980).  To state a claim for damages under Bivens, a plaintiff must show that federal officers violated his constitutional rights.  See Malesko, 534 U.S. at 66.

   This Court reads the Complaint, when combined with Plaintiff's affidavit and the documents attached to the Complaint, as attempting to assert the following claims under Bivens:  (a) deprivation of Plaintiff's personal property violated due process, and (b) Plaintiff's conditions of confinement from February 3, 2010, through July 7, 2010, imposed atypical and significant hardship in relation to the ordinary incidents of prison life without due process, see Sandin v.

Conner, 515 U.S. 472, 484 (1995), and inflicted cruel and unusual punishment in violation of the Eighth Amendment.

A. Due Process - Property Loss

Plaintiff asserts that he was deprived of personal property when he was sent to the SHU. However, property loss caused by the intentional or negligent unauthorized act of a prison official, as alleged in the instant Complaint, does not give rise to a procedural due process claim where a post-deprivation remedy satisfying minimum procedural due process requirements is available for the loss. See Parratt v. Taylor, 451 U.S. 527 (1981) (overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)); see also Zinermon v. Burch, 494 U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S. 517 (1984); Holman, 712 F.2d at 856. The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80, provides a post-deprivation judicial remedy to persons who believe they were deprived of property at the hands of government officials. The Court finds that the FTCA was available to Plaintiff as a remedy for his alleged property loss at the hands of prison officials.[3] See Akervik v. Ray, 24 Fed. App'x. 865, 2001 WL 1429413 (10th Cir. 2001) (dismissing due process claim by federal prisoner against

---

[3] Plaintiff's due process claim fails as a matter of law even if he is presently time-barred from pursuing his claim under the FTCA. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 437 (1982); Holman, 712 F.2d at 857 & n.3.

13

prison officials for loss of art work because the FTCA provides an adequate post-deprivation remedy); Slade v. Petrovsky, 528 F. Supp. 99 (M.D. Pa. 1981) (same); see also Holman, 712 F.2d at 857 (finding no due process violation for state prisoner's property loss under Fourteenth Amendment because state tort claims act provided adequate post-deprivation remedy); Asquith v. Volunteers of America, 1 F. Supp.2d 405, 419 (D.N.J. 1998), aff'd 186 F.3d 407 (3d Cir. 1999) (same).  Because the FTCA provided all the process that was due for Plaintiff's alleged property loss, this Court will dismiss Plaintiff's due process deprivation of property claim with prejudice for failure to state a claim upon which relief may be granted.  See 28 U.S.C. § 1915A(b)(1).

B.   Conditions of Confinement

Plaintiff alleges that his due process and Eighth Amendment rights were violated while he was in administrative detention at FCI Fort Dix from February 3 to 17, 2010, and MDC Brooklyn from February 18, 2010, through July 7, 2010.

A prisoner is deprived of a liberty interest protected by the Due Process Clause when the conditions of confinement "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995).  In considering whether the conditions impose atypical and significant hardship in relation to the ordinary incidents of prison life, a court must consider

"two factors:  1) the amount of time the prisoner was placed into . . . segregation; and 2) whether the conditions of his confinement . . . were significantly more restrictive than those imposed upon other inmates in solitary confinement." Shoats v. Horn, 213 F. 3d 140, 144 (3d Cir. 2000).

To state an Eighth Amendment conditions of confinement claim, an inmate must allege facts plausibly showing (1) objectively, his conditions were so severe that they deprived him of an identifiable, basic human need, e.g, food, clothing, shelter, sleep, recreation, medical care, and reasonable safety, see Farmer v. Brennan, 511 U.S. 825, 834 (1994); Helling v. McKinney, 509 U.S. 25, 32 (1993); Wilson v. Seiter, 501 U.S. 294, 305 (1991), and (2) defendant was deliberately indifferent to the risk of harm to the plaintiff's health or safety.  See Farmer, 511 U.S. at 837.

Here, the allegations in this Complaint, when read with those in Plaintiff's affidavit, plausibly satisfy the first prong.  However, Plaintiff's allegations do not satisfy the subjective component of a conditions of confinement claim.  An individual defendant in a civil rights action must participate in the alleged wrongdoing.  See Iqbal, 129 S. Ct. at 1948 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the

15

Constitution"); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs").  A supervisory defendant cannot be found liable under Bivens solely on the basis of knowledge and acquiescence in a subordinate's misconduct. Iqbal, 129 S. Ct. at 1949.  Here, Plaintiff does not assert sufficient factual matter in his submissions to show that each defendant knowingly placed him in allegedly unconstitutional conditions or knowingly decided to house him under these conditions.

Similarly, Plaintiff does not assert facts showing that each named individual defendant was deliberately indifferent to his health or safety.  To establish deliberate indifference, a plaintiff must set forth facts "show[ing] that the official was subjectively aware" of the allegedly substandard conditions.  See Farmer v. Brennan, 511 U.S. 825, 829 (1994).  "The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001).  Here, Plaintiff makes no allegations whatsoever plausibly showing that each defendant was deliberately indifferent.  Because the Complaint makes no factual allegations showing the subjective liability of each named

16

defendant, and because vicarious liability does not apply under Bivens, the Complaint fails to satisfy the subjective component of a conditions of confinement claim under the Eighth Amendment and the Due Process Clause.

However, because it is conceivable that Plaintiff simply neglected to specify facts that could make out a conditions of confinement claim, this Court will grant him leave to file an amended complaint that is complete on its face stating a conditions of confinement claim under the Due Process Clause and/or the Eighth Amendment against defendants.[4]

### III.  CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's application to proceed in forma pauperis and dismisses the Complaint.

                                    s/Renée Marie Bumb
                                    **RENÉE MARIE BUMB**
                                    **United States District Judge**

Dated: December 19, 2011

---

[4] If Plaintiff elects to file an amended complaint, this amended complaint should be complete on its face, in that the amended complaint itself should include all relevant factual allegations which are presently in the Complaint and Plaintiff's affidavit, as well as allegations which are not in those documents showing that each named defendant is liable.

17