NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                :
CESAR VELAZQUEZ,                :
                                :   Civil Action No. 11-2459 (RMB)
               Plaintiff,       :
                                :
          v.                    :
                                :
DONNA ZICKERFOOSE, et al.,      :
                                :        **OPINION**
               Defendants.      :
_____:

**BUMB, District Judge:**

This matter is before the Court upon the Clerk's receipt of
Plaintiff's second amended complaint, <u>see</u> Docket Entry No. 10
("Complaint-III").  The Clerk restored this matter to the Court's
active docket.  <u>See</u> Docket Entry No. 13.

**I.     FACTUAL BACKGROUND**

> On May 10, 2001, [Plaintiff,] a [felon with] prior drug
> trafficking and robbery convictions, [pled guilty to
> and] was sentenced for his role in [a] large-scale
> distribution of cocaine base, [<u>i.e.</u>,] "crack" cocaine,
> in York, Pennsylvania, which resulted in the delivery
> of more than 1 kilo of crack cocaine into [that]
> community.  As a result of the large drug weights
> involved, and [Plaintiff's] . . . prior convictions for
> drug and robbery offenses, [he was, upon being]
> qualified as a Career Offender[,] . . . sentenced [by
> United States District Court for the Middle District of
> Pennsylvania] to 240 months imprisonment.

<u>United States v. Velazquez, et al.</u>, Crim. Action No. 00-0290

(YK0 (M.D. Pa.), Docket Entry No. 88, at 1.

Plaintiff's judgment of conviction was entered on May 10, 2001, see id., Docket Entry No. 73, and he began serving his term shortly thereafter at a federal facility in Pennsylvania.  See Instant Matter, Docket Entry No. 10, at 9.  He was transferred from that facility to the FCI Fort Dix eight years later, i.e., on January 20, 2009.  See id. at 2.[1]  Two and a half years after that transfer, he commenced this matter.  See Docket Entry No. 1.

Plaintiff named six Fort Dix officials as defendants: the warden, the associate warden, the facility's captain, the facility's investigative agent and the unit manager and Unit counselor of the housing unit where Plaintiff resided during his Fort Dix stay.  See id. at 2-6.  As to the warden, Plaintiff alleged that she was liable to him because "[s]he [was] the Chief Executive Officer of [Fort Dix] responsible for . . . management of the [facility]."  Id. at 2.  As to the associate warden, Plaintiff asserted that she was liable to him because "she [was] an assistant, next in line, to the [w]arden."  Id. at 3.  As to the captain, Plaintiff states that she was liable to him because "[s]he ha[d] charge over all Correctional Officers . . . and [was] in charge of all matters dealing with security of the institution."  Id. at 4.

_____

[1]  In August 2012, Plaintiff notified this Court of his re-transfer to a federal facility in West Virginia, and – in September 2013, – he informed this Court of his re-re-transfer to a federal facility in Texas.  See Docket Entries Nos. 11 and 12.

With regard to the investigative agent, Plaintiff alleged that he was liable to Plaintiff because "[h]e [was] a Special Investigator . . . of inmates and inmate matters, and matters occurring between inmates and staff." Id. Finally, as to the Unit Manager and Unit Counselor, Plaintiff stated that they were liable to him because the former "direct[ed] and manage[d] the housing unit [where Plaintiff resided when he was in Fort Dix general population] and [was] responsible for the unit's operation and security," while the latter "handles phone call requests, special concerns and requests of inmates, and requests for administrative remedy form[s]." Id. at 5-6.

The events underlying Plaintiff's claims are, unfortunately, described with a such rhetoric that makes understanding the alleged facts a difficult task.[2]  The best this Court can surmise, the alleged events were as follows:

In March 2009, there was a series of violent altercations between certain members of the Bloods (a predominantly African-

---

[2]  For instance, describing correctional officers who executed his transfer from Fort Dix general prison population to the facility's Special Housing Unit ("SHU"), Plaintiff asserted that he was "kidnapped by armed gunmen," Docket Entry No. 10, at 6, 14.  The Court notes that Plaintiff's "'poetic license' [statements] are not a basis for relief.  Simply put, dry facts stated in a clear and concise pleading speak volumes for the purposes of any legal proceeding, while eloquent poetic 'nothings' are invariably dismissed as pure rhetoric." Clauso v. Glover, 2012 U.S. Dist. LEXIS 139205, at *21-22 (D.N.J. Sept. 26, 2012).

3

American street gang) and the Latin Kings (a predominantly Hispanic-American street gang) who were confined at Fort Dix. See id. at 9. In response to those altercations, the Fort Dix officials: (a) enabled the facility's emergency protocol (a so-called "lock-down") that restricted the inmates' daily operations and their mobility around the facility; and (b) commenced an investigation of this chain of disciplinary infractions. See id. In connection with that investigation, numerous inmates were transferred from the general population to the SHU. See id. Plaintiff, who was of Hispanic origin, was among the inmates transferred to the SHU; he states that the officers advised him that the transfer was executed for his own protection since the officers were concerned that, if Plaintiff remained in general prison population, he could have been perceived as an "informant" and, thus, might have been hurt by other inmates. See id.[3]

Plaintiff asserts that he was housed at the SHU for about one month in connection with that investigation and, during that month, developed an antagonistic relationship with a certain inmate whom Plaintiff thought to be an informant. See id. at 10.

---

[3] Plaintiff, however, believes that he was placed in jeopardy because of being housed at the SHU, since he speculates that the members of the Bloods gang confined at the SHU could have perceived him as a member of the Latin Kings and hurt him. See Docket Entry No. 10, at 10. His pleadings, however, make it abundantly clear that Plaintiff's speculations were wholly unfounded and he was neither attacked nor harmed in any way during his stay at the SHU. See, generally, Docket Entry No. 10.

Upon expiration of that month, Plaintiff was transferred back to Fort Dix general population.  See id. at 9-10.  Plaintiff then alleges that, on January 26, 2010 (i.e., about ten months later), he was among the inmates who became subject to another Fort Dix investigation.  That second investigation was based on an introduction of certain contraband items into Fort Dix and, in addition, on a mass violation of BOP regulations by numerous inmates who were housed in three housing units, one of which was Plaintiff's, since the inmates in those units activated the facility's fire alarms  hoping to disrupt Fort Dix operations.[4]  See id. at 11.  The inmates subject to that second investigation were also transferred to the SHU, and Plaintiff was one of those inmates.[5]  See id. at 14.

---

[4]  The inmates activated the fire alarms in order to protest the possibility of being transferred to a federal facility in Massachusetts (which transfer the Fort Dix officials contemplated to relieve overcrowding at Fort Dix).  See Docket Entry No. 10, at 11-14.  Plaintiff, however, speculates that, as to him, this second investigation could have been retaliatory in the sense that it could have been based upon: (a) the alleged informant's dislike of Plaintiff; and/or (b) the numerous phone calls Plaintiff's family members were placing to Fort Dix officials ten months ago, i.e., during the first investigation (that was based on the altercations between the Bloods and Latin Kings) since, during that first investigation, Fort Dix officials shared with Plaintiff their concern with the excessive number and undue frequency of those phone calls.  See id.  at 11.

[5]  Since the SHU became overcrowded during that second investigation, many SHU inmates had to triple-cell; Plaintiff asserts that had to triple-cell, too.  See Docket Entry No. 10 at 14.  A number of other inmates (who were not subject to that second investigation) were transferred to the Massachusetts

The bulk of Plaintiff's claims, hence, derives from the events related to that second investigation/second confinement at the SHU, as well as Plaintiff's transfer to the Brooklyn facility performed once he was released from the SHU.  See id. at 14-35.

Specifically, Plaintiff asserts that, when he was moved to the SHU in connection with this second investigation, he was directed to place his gold chain and hand watch into his locker. See id. at 14-15.[6]  He also asserts that the SHU cell where he was placed (and where he triple-celled) was cold because the heating system at the SHU was broken, and Plaintiff learned that the Fort Dix officials – while working to fix the heating problem – could not resolve the heating issue fast enough to prevent the SHU cells from being cold during Plaintiff's SHU stay.  See id. at 15-16.

Since, after spending a brief period at the SHU, Plaintiff was transferred to the Brooklyn facility, his second SHU stay was only two-weeks.  See id. at 16.  He, however, extensively

_____

facility or to another facility (located in Brooklyn) to relieve overcrowding at Fort Dix.  Also, as this second investigation progressed, those inmates who were released from the Fort Dix SHU were also transferred to Brooklyn, again, with an express purpose to relieve overcrowding at Fort Dix.  See id. at 14-16.

[6]  Although Plaintiff asserts that he had to sleep on a "bare floor" during his two weeks at the SHU, it appears that he might have been sleeping on a *mattress* placed on the floor, and the sole accommodation missing was the bed linens.  See Docket Entry No. 10, at 15 (asserting that Plaintiff was sleeping "without bedding").

6

elaborates on his displeasures with his transfer to Brooklyn and
on his Brooklyn conditions of confinement.  See id. at 16-18
(raising challenges about his bedding, meals, medical care,
visitation privileges, recreation activities, etc. in Brooklyn).
He states that he wrote to Fort Dix officials complaining about
his Brooklyn conditions of confinement and was advised that his
claims had to be filed and litigated locally.  See id. at 18
(expressing Plaintiff's disappointment with that response because
Plaintiff preferred to considered himself, "technically[,] on
papers[,] an inmate at FCI Fort Dix").

Plaintiff states that he was transferred from Brooklyn back
to Fort Dix general population on July 7, 2010, i.e., when the
overcrowding at Fort Dix subsided.  See id. at 19.  He asserts
that, upon his return, he discovered that his work boots were
missing, as well as his watch, a pair of sneakers and a tee-
shirt.[7]  See id.

---

[7]  The Complaint-III is silent as to whether Plaintiff put
his boots, sneakers and tee-shirt into his locker prior to his
transfer to the SHU and/or to Brooklyn.  It is unclear whether
the watch he placed in his locker was the very watch allegedly
missing.  See generally, Complaint-III.  The Complaint-III,
however, suggests that the gold chain he placed in the locker
remained safe.  See id.  This Court, thus, presumes – without
making a finding to that effect – that all these items, i.e., the
chain, the watch, the boots, the sneakers and the tee-shirt, were
fitted into Plaintiff's locker, but only the gold chain remained
safe.  However, as discussed below – and as this Court's prior
opinion has already detailed – such presumption is of no import
for the purposes of the analysis involved here.

7

Maintaining that Defendants conspired to violate and did violate his constitutional rights by the subjecting him to the above-detailed events, Plaintiff commenced the instant matter under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).  See id. at 1 and 19-32.

He seeks $1,016,809.65 in damages.  See id. at 32-33.

## II.   **PROCEDURAL BACKGROUND**

Since Plaintiff's original complaint ("Complaint-I") stated virtually identical claims, compare Docket Entry No. 1 to Docket Entry No. 10, this Court screened the original complaint and dismissed some of Plaintiff's claims with prejudice and others without prejudice.  See Docket Entries Nos. 1 and 2.  For instance, addressing Plaintiff's alleged loss of the boots, sneakers, watch and tee-shirt, this Court explained that

> property loss caused by the intentional or negligent unauthorized act of a prison official . . . does not give rise to a procedural due process claim where a post-deprivation remedy satisfying minimum procedural due process requirements is available for the loss. See Parratt v. Taylor, 451 U.S. 527 (1981) (overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)); see also Zinermon v. Burch, 494 U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S. 517 (1984); Holman [v. Hilton], 712 F.2d [854], 856 [(3d Cir. 1983)].  The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80, provides a post-deprivation judicial remedy to persons who believe they were deprived of property at the hands of government officials.  [An action under] the FTCA was available to Plaintiff as a remedy for his alleged property loss at the hands of prison officials [but he elected not to pursue that readily-available remedy].  See Akervik v. Ray, 24 F. App'x 865, (10th Cir. 2001) (dismissing a

8

<u>Bivens</u> due process claim by federal prisoner against prison officials for loss of art work because the FTCA provides an adequate post-deprivation remedy); <u>Slade v. Petrovsky</u>, 528 F. Supp. 99 (M.D. Pa. 1981) (same); . . . . Because the FTCA provided all the process that was due for Plaintiff's alleged property loss, this Court will dismiss Plaintiff's due process deprivation of property claim *with prejudice* . . . . <u>See</u> 28 U.S.C. § 1915A(b)(1).

<u>Velazquez v. Zickefoose</u>, 2011 U.S. Dist. LEXIS 145623, at *16-17

(D.N.J. Dec. 19, 2011) (footnote omitted).

Then, switching to Plaintiff's conditions of confinement

challenges, this Court explained that a prisoner states a viable

conditions-of-confinement claim only if the facts he alleges: (a)

show *personal* involvement of each named defendant in the alleged

events; and (b) establish that the alleged events

"impose[d an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995). In considering whether the conditions impose atypical and significant hardship in relation to the ordinary incidents of prison life, a court must consider "two factors: 1) the amount of time the prisoner was placed into . . . segregation; and 2) whether the conditions of his confinement . . . were significantly more restrictive than those imposed upon other inmates in solitary confinement." <u>Shoats v. Horn</u>, 213 F. 3d 140, 144 (3d Cir. 2000). [Thus, to] state an Eighth Amendment conditions of confinement claim, an inmate must allege facts plausibly showing (1) objectively, his conditions were so severe that they deprived him of [a] basic human need . . . , <u>see</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994); <u>Helling v. McKinney</u>, 509 U.S. 25, 32 (1993); <u>Wilson v. Seiter</u>, 501 U.S. 294, 305 (1991), and (2) [the named] defendant[s were] deliberately indifferent to the risk of [particular] harm [the inmate suffered]. <u>See</u> <u>Farmer</u>, 511 U.S. at 837.

<u>Id.</u> at *18-19.

9

Pointing out that "Plaintiff [failed to] assert facts showing that each named individual [D]efendant was [personally involved in the alleged events and] deliberately indifferent to his health or safety," this Court dismissed Plaintiff's conditions of confinement claims with leave to replead. Id. at *20; see also Docket Entry No. 2.Brooklyn

In response, Plaintiff filed his first amended complaint. See Docket Entry No. 4 ("Complaint-II"). The Complaint-II, albeit injected with additional and, unfortunately, equally conclusory allegations, substantively repeated the facts asserted in the Complaint-I. Compare Docket Entry No. 1 to Docket Entry No. 4. Thus, this Court dismissed the Complaint-II upon again explaining to Plaintiff that he was obligated to plead facts showing each defendant's personal involvement in the events amounting to a plausible legal wrong and, out of an abundance of caution, the Court again granted Plaintiff leave to amend. See Docket Entries Nos. 5 and 6. The Complaint-III at bar followed, reciting the same challenges the third time and even repeating Plaintiff's loss of property claims that were dismissed with prejudice upon this Court's screening of the Complaint-I. See Docket Entry No. 10.

## III. DISCUSSION

### A. DUE PROCESS CLAIMS

While the Complaint-III recites Plaintiff's loss of property claims, this recital does not change the outcome of this Court's analysis.  As this Court already pointed out, those claims had to be exhausted and litigated under the FTCA.

"The FTCA 'was designed primarily to remove the sovereign immunity of the United States from suits in tort, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances.'"  Sosa v. Alvarez-Machain, 542 U.S. 692, 700 (2004) (quoting Richards v. United States, 369 U.S. 1, 6 (1962)); CNA v. United States, 535 F.3d 132, 138 (3d Cir. 2008).  Federal district courts have jurisdiction over civil actions against the United States for damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his[/her] office or employment, under the circumstance where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

Thus, an inmate may sue the United States – under the FTCA – to recover damages for loss of property he suffered during confinement in a federal prison that resulted from negligence or intentional wrong of a government employee.  See Rinaldi v. United States, 2010 U.S. Dist. LEXIS 66024, at *11 (M.D. Pa. July

11

1, 2010) (relying on <u>United States v. Muniz</u>, 374 U.S. 150 (1963)).[8]  In contrast to FTCA actions, which must be brought against the *United States*, <u>Bivens</u> constitutional tort lawsuits can only be lodged against government officials acting in their individual capacities.  Thus, a <u>Bivens</u> action cannot be brought against the United States, or a federal agency or its agents, like Fort Dix officials, in their official capacities: such claims are barred by the doctrine of sovereign immunity.  <u>See</u> <u>FDIC v. Meyer</u>, 510 U.S. 471, 483 (1994); <u>Huberty v. United States Ambassador to Costa Rica</u>, 316 F. App'x 120 (3d Cir. Aug. 21, 2008); <u>Douglas v. United States</u>, 285 F. App'x 955 (3d Cir. 2008).

Thus, to recover for his alleged loss of property, Plaintiff had to commence a timely and duly-exhausted-administratively FTCA action against the *United States*.  He did not.  He cannot now cure that oversight by raising his loss of property claims against Defendants named in the instant <u>Bivens</u> matter.  That is why this Court dismissed Plaintiff's loss of property claims when it initially screened the Complaint-I and, because this oversight could not be cured by repleading, this Court dismissed those claims with prejudice and then again dismissed them addressing

---

[8]  Due to the exclusive nature of the remedy available under the FTCA, and its jurisdictional prerequisites, a court may *not* entertain a civil suit for a claim cognizable under 28 U.S.C. § 1346(b) against "any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 2679(b)(1).

Plaintiff's Complaint-II.  And that is why these claims will have to be again dismissed now with prejudice.[9]

**B.   FIRST AND EIGHTH AMENDMENT CLAIMS**

The remainder of Plaintiff's challenges suggests his interest in raising claims asserting violations of his First and Eighth Amendment rights, *not* due process rights.[10]

---

[9]   This Court cannot rule out that Plaintiff, being a pro se litigant, failed to appreciate the meaning of a "dismissal with prejudice."  A "dismissal with prejudice" means that a claim is *conclusively* dismissed, and the court denies the litigant an opportunity to re-plead that claim.  See, e.g., Maydak v. United States Dep't of Educ., 150 F. App'x 136, 138 (3d Cir. Pa. 2005) ("The dismissal with prejudice means that [the plaintiff] may not seek to reinstate this [claim]").

[10]   In addition to Plaintiff's loss of property claims, two barely fleshed out allegations could be construed as Plaintiff's due process challenges: (a) his expression of displeasure with Fort Dix officials' decision to transfer him to Brooklyn; and (b) his passim conclusion that his Equal Protection rights could have been violated.  However, if such due process allegations were intended, both are subject to dismissal as meritless.  It is well established that no inmate has a Due Process liberty interest in being assigned to or remaining in the correctional institution of his/her choice.  See Wilkinson v. Austin, 545 U.S. 209 (2005) (noting that the Constitution does not give rise to a liberty interest in avoiding transfers to more adverse conditions of confinement); Olim v. Wakinekona, 461 U.S. 238 (1983) (same); Meachum v. Fano, 427 U.S. 215, 224-25 (1976) (same); Walker v. Hughes, 558 F.2d 1247, 1252 (6th Cir. 1977) ("Federal statutory law gives federal prison officials full discretion in the treatment of prisoners and does not restrict the authority of prison officials over the inmates as to placement in more restrictive living status, transfer to other prisons").  Indeed, the matters of placement of prisoners are among the "wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts."  Meachum, 427 U.S. 225.  In fact, the Supreme Court has expressly pointed out that:

## 1.   <u>Personal Involvement Requirement</u>

To properly plead Defendants' liability, Plaintiff must assert facts personally implicating *each* named Defendant in the events that amount to plausible constitutional wrongs.   It has been long established that claims based solely on the theory of <u>respondeat</u> <u>superior</u> are facially deficient.   See <u>Ashcroft v.</u>

---

> The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another. . . . Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the . . . prison system. Confinement in any . . . institution [] is within the normal limits or range of custody which the conviction has authorized . . . to impose.

<u>Id.</u> at 224-25 (1976).   Plaintiff's equal protection allegations fare even worse.   The Equal Protection Clause protects similarly situated individuals from unequal treatment under the law.   See <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985); <u>Kuhar v. Greensburg-Salem Sch. Dist.</u>, 616 F.2d 676, 677 (3d Cir. 1980).   "The central purpose of the Equal Protection Clause is the prevention of official conduct discriminating on the basis of race," <u>Washington v. Davis</u>, 426 U.S. 229, 239 (1976), or any other suspect classification.   Thus, Plaintiff had to establish that Defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose.   See <u>Bradley v. United States</u>, 299 F.3d 197, 205-06 (3d Cir. 2002).   To show the former, Plaintiff had to plead facts establishing that he was a member of a protected class treated differently from those who were similarly situated but not in that protected class.   See <u>id.</u>; see also <u>PG Publ. Co. v. Aichele</u>, 705 F.3d 91, 115 (3d Cir. 2013).   Here, the Complaint-III indicates that a massive amount of Fort Dix ineach Plaintiff's pleading unambiguously indicates that the inmates of all races were investigated/placed at the SHU during the second Fort Dix investigation and/or transferred to Massachusetts and Brooklyn.   Hence, Plaintiff's equal protection challenges are facially meritless.

Iqbal, 556 U.S. 662, 676-77 (2009); see also Colburn v. Upper
Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991); accord Solan v.
Ranck, 326 F. App'x 97, 100-01 (3d Cir. 2009) ("A defendant in a
civil rights action must have personal involvement in the alleged
wrongs; liability cannot be predicated solely on the operation of
respondeat superior"), cert. denied, 558 U.S. 884 (2009).

Thus, Plaintiff's reliance on supervisory positions of the
warden, associate warden and captain cannot support a viable
claim, and there are no facts alleged to personally implicated
the investigative agent, the Unit Manager or the Unit Counselor
in any cognizable wrong.  Plaintiff, seemingly mindful of this
core deficiency, aims to stitch his claims to Defendants by
asserting that he was subjected to unconstitutional conditions of
confinement at the Brooklyn facility.  However, none of the Fort
Dix officials – including all Defendants named in this matter —
could have been personally involved in the administration of the
Brooklyn facility.  Correspondingly, Plaintiff's claims based on
the events that transpired in Brooklyn should have been, upon due
administrative exhaustion, litigated in a separate Bivens matter
filed with the United States District Court for the Eastern
District of New York, as Plaintiff was advised by Fort Dix
officials.  In fact, a virtually identical claim was recently
addressed and dismissed as facially deficient in Brown v. United

<u>States</u>, 2014 U.S. Dist. LEXIS 50309 (D.N.J. Apr. 11, 2014), where

the <u>Brown</u> court stated:

> [P]laintiff fails to show that any of the [D]efendants
> were responsible for [P]laintiff's conditions of
> confinement while at [the Brooklyn] facility.
> Accordingly, to the extent the claims in the amended
> complaint relate to his conditions of confinement at
> MDC — Brooklyn, they will again be dismissed.

<u>Id.</u> at *20.[11]

Therefore, all Plaintiff's challenges against each named

Defendant will be dismissed with prejudice for failure to assert

facts establishing these Defendants' personal involvement in

conduct that could qualify as a plausible constitutional wrong.[12]

---

[11]   Moreover, this Court is not in the position to reach the
issue of whether Plaintiff's rights were violated by the events
that allegedly transpired at the Brooklyn facility since this
Court has no <u>in personam</u> jurisdiction over the officials who
might have wronged Plaintiff during his Brooklyn stay.  No
statement in this Opinion shall be construed as barring Plaintiff
from raising these claims in the proper forum, <u>i.e.</u>, the United
States District Court for the Eastern District of New York.
Analogously, no statement in this Opinion shall be construed as
expressing this Court's opinion that Plaintiff's claims against
the Brooklyn officials should be deemed timely (or untimely),
properly exhausted (or unexhausted) and meritorious (or
meritless) in the event Plaintiff commences such a civil action.

[12]   Generally, a plaintiff may be granted "leave [to amend,]
. . . when justice so requires." <u>Foman v. Davis</u>, 371 U.S. 178,
182 (1962); <u>Lorenz v. CSX Corp.</u>, 1 F.3d 1406, 1414 (3d Cir.
1993).  Indeed, "[t]he Federal Rules reject the approach that
pleading is a game of skill in which one misstep . . . may be
decisive to the outcome and accept the principle that the purpose
of pleading is to facilitate a proper decision on the merits."
<u>Foman</u>, 371 U.S. at 182-83.  However, where the plaintiff had
already amended plaintiff's complaint and yet failed to allege
sufficient facts, the courts may find that "[t]hree bites at the
apple is enough," and conclude that it is proper to deny leave to

However, mindful that Plaintiff might be able to cure the aforesaid deficiency by naming defendants personally involved in constitutional torts that might have transpired *at Fort Dix*, this Court finds it prudent not to end its analysis at this juncture. Rather, this Court finds it warranted to examine all of Plaintiff's First and Eighth Amendment claims, provided that they were raised in connection with Plaintiff's Fort Dix stay, on the merits.

### 2. <u>Conspiracy Claim</u>

Plaintiff's overarching claim is his speculation that Fort Dix officials could have conspired to violate his constitutional rights.  That allegation, however, fail to state a plausible claim.

42 U.S.C. § 1985 provides:

> If two or more persons in any State . . . conspire [to] depriv[e], either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State . . . , the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1986 states:

------

replead. <u>Salinger v. Projectavision, Inc.</u>, 972 F. Supp. 222, 236 (S.D.N.Y. 1997) (citing <u>Olkey v. Hyperion 1999 Term Trust, Inc.</u>, 98 F.3d 2 (2d Cir. 1996)).

> Every person who, having knowledge that any of the
> wrongs conspired to be done, and mentioned in [S]ection
> 1985 of this title, are about to be committed, and
> having power to prevent or aid in preventing the
> commission of the same, neglects or refuses so to do,
> if such wrongful act be committed, shall be liable to
> the party injured . . . for all damages caused by such
> wrongful act, which such person by reasonable diligence
> could have prevented.

Thus, to properly state a § 1983 conspiracy claim,[13] Plaintiff must allege facts showing that persons acting under color of law conspired to deprive him of a federally protected right, see Perano v. Twp. of Tilden, 423 F. App'x 234 (3d Cir. 2011), i.e., his facts must establish that the defendants he had in mind reached a "'meeting of the minds'" toward that goal. Startzell v. City of Philadelphia, Pennsylvania, 533 F.3d 183, 205 (3d Cir. 2008) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 (1970). Here, Plaintiff merely states, in a conclusive and speculative manner, that there must have been a conspiracy against him. No statement made in the Complaint-I, Complaint-II or Complaint-III indicates that any Fort Dix officials reached a meeting of minds so as to deprive him of his constitutional rights. Since – having three opportunities to plead that conspiracy claim – Plaintiff has stated no facts in support of

---

[13] "A Bivens action . . . is the federal equivalent of the § 1983 cause of action against state actors, [it] will lie where the defendant has violated the plaintiff's rights under color of federal law." Brown v. Philip Morris, Inc., 250 F.3d 789, 801 (3d Cir. 2001).

that claim, it will be dismissed with prejudice as deficient regardless of whether it was raised against the named Defendants or Plaintiff had other Fort Dix officials in mind.

> As the Court of Appeals observed:
>
> > [Plaintiff] based his civil conspiracy claim upon the conclusory allegation that prison officials agreed to act against him.  Without more, the bare allegation of an agreement is insufficient to sustain a conspiracy claim.  See Abbott v. Latshaw, 164 F.3d 141, 148 (3d Cir. 1998) (conclusory allegations of concerted action are insufficient for a § 1983 conspiracy claim); Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989) (allegations supporting a conspiracy claim . . . must be sufficiently specific).  Dismissal [is] therefore appropriate.

Michtavi v. United States, 345 F. App'x 727, 731 (3d Cir. 2009).

### 3.   Substantive Claims Related to Fort Dix

In addition to his key conspiracy claim, Plaintiff also alleged that his constitutional rights were, in fact, violated by the events that transpired at Fort Dix.  Plaintiff errs.

#### a.   First Amendment Claim

Here, Plaintiff speculates that his second confinement at the SHU (in connection with the second investigation based on contraband and fire alarms) might have been "retaliatory" because, during the first investigation/first SHU confinement (based on the altercations between the Bloods and Latin Kings): (a) Plaintiff had developed an antagonistic relationship with an inmate whom he believed to be an informant, and Plaintiff speculates that the informant might have had made less-than-

flattering comments about him to Fort Dix officials; and/or (b)

Fort Dix officials shared with Plaintiff their concern with the

undue number and frequency of the phone calls placed by

Plaintiff's relatives.

> "A prisoner alleging retaliation must show (1)
> *constitutionally protected conduct*, (2) an adverse
> action by prison officials sufficient to deter a person
> of ordinary firmness from exercising his constitutional
> rights, and (3) *a causal link* between the exercise of
> his constitutional rights and the adverse action taken
> against him."

Mack v. Yost, 427 F. App'x 70, 72 (3d Cir. 2011) (per curiam)

(quoting Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003),

emphasis supplied).   Here, Plaintiff's allegations facially fail

to meet these requirements, since neither Plaintiff's act of

developing an adverse relationship with the alleged informant

nor the numerous frequent phone calls Plaintiff's relatives

placed to Fort Dix officials inquiring about Plaintiff's safety

at the SHU could qualify as *Plaintiff's constitutionally*

*protected speech*.[14]

--------

[14]   In addition, the ten-month period between the first and
second investigations suggest the absence of a causal link.   To
establish a causal connection, Plaintiff must show that the
conduct at issue was a substantial or motivating factor for the
adverse response.   See Velasquez v. Diguglielmo, 516 F. App'x 91,
95 (3d Cir. 2013) (per curiam) (citing Carter v. McGrady, 292
F.3d 152, 157, 158 (3d Cir. 2002)).

> [T]he plaintiff (here, a prisoner) usually has to prove
> one of two things: (1) an unusually suggestive time
> proximity between the protected activity and the
> allegedly retaliatory action; or (2) a pattern of

Since Plaintiff's allegations unambiguously indicate that he has no viable retaliation claim, and that deficiency cannot be cured by repleading, his First Amendment challenges will be dismissed with prejudice regardless of whether or not they were raised against the named Defendants or Plaintiff had some other Fort Dix officials in mind.

### b.   Eighth Amendment Claims

Plaintiff also asserted that Fort Dix officials were liable to him for overcrowding at Fort Dix, as well as for exposing him to what Plaintiff speculates could have been a risk of injury during the first investigation, and for housing him at a cold

---

antagonism coupled with timing to establish a causal link. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). "If neither of these showings is made, then the plaintiff must show that, from the evidence in the record as a whole, the trier of fact should infer causation." Id.

DeFranco v. Wolfe, 387 F. App'x 147, 154 (3d Cir. 2010). If a few months expired between the alleged events, such passage of time is usually too great to warrant a finding of a causal connection. Accord Garcia v. New Jersey State Prison, 2007 U.S. Dist. LEXIS 65779 (D.N.J. Sept. 6, 2007) (seven months are too great a delay between the events to support an inference of causality). Here, Plaintiff asserted a ten-month gap between the first and second investigation. Moreover, he verifies that Fort Dix officials commenced the second investigation on the basis of contraband and the disruptive pulling of fire alarms performed by the inmates in three housing units, one of which was Plaintiff's. In light of this record, no reasonable trier of fact could infer the required causation for the purposes of Plaintiff's retaliation claim.

SHU cell during the second investigation and for subjecting him
to triple-celling during that second SHU stay.

None of these allegations states a viable claim.  As this
Court already twice explained to Plaintiff, to state an Eighth
Amendment conditions of confinement claim, Plaintiff must allege
facts plausibly showing that his conditions were objectively so
severe that they deprived him of a basic human need and that the
defendants were *deliberately indifferent* to the risk of the
particular harm that Plaintiff suffered.  See Farmer, 511 U.S.
at 834-37; Helling, 509 U.S. at 32; Wilson, 501 U.S. at 305.

Plaintiff's first assertion is based on the overcrowding at
Fort Dix.  However, Plaintiff's pleadings are filled with
statements verifying that Fort Dix officials did indeed take
continuous actions aimed at relieving overcrowding at Fort Dix
in general and at the facility's SHU in particular: by
transferring the Fort Dix inmates to the Massachusetts and
Brooklyn facilities.  Therefore, it is self-evident that Fort
Dix officials were not deliberately indifferent to overcrowding.
Hence, Plaintiff's overcrowding allegations are contradicted by
his own factual predicate and will be dismissed with prejudice
for failure to state a claim upon which relief can be granted.

Plaintiff's next assertion is based on his speculation that
he might have been exposed to a danger of harm when he was
transferred to the SHU during the first Fort Dix investigation,

22

even though Plaintiff's pleadings made it abundantly clear that his speculative fears were unfounded.  Speculations as to what might have had happened – but did not happen – cannot amount to a viable claim, since such challenges are merely hypotheticals.  See Brooks v. City of Pine Knot, 2009 U.S. Dist. LEXIS 97870, at *15 (E.D. Ky. Oct. 21, 2009) (mere speculations that the inmate might have been exposed to and contracted swine flu are subject to dismissal); see also Dawson v. Frias, 2010 U.S. Dist. LEXIS 30513 at *8 (D.N.J. Mar. 30, 2010) ("speculation as to what might or might not happen in the future" cannot serve as a basis for a valid claim) (citing Rouse v. Pauliilo, 2006 U.S. Dist. LEXIS 17225 (D.N.J. Apr. 5, 2006) (dismissing speculative claim as to hypothetical future events and citing Kirby v. Siegelman, 195 F.3d 1285 (11th Cir. 1999)); Pilkey v. Lappin, 2006 U.S. Dist. LEXIS 44418, at *45 (D.N.J. June 26, 2006) ("Plaintiff's [anxieties] fail to state a claim upon which relief may be granted"); Patterson v. Lilley, 2003 U.S. Dist. LEXIS 11097 (S.D.N.Y. June 20, 2003) (defendants could only be found liable to violations ensuing from an existing condition, not to a speculative future injury).  Since Plaintiff's self-serving hypotheticals were proven wrong by the actual events, his speculative claims will be dismissed with prejudice regardless of whether they were raised against the named Defendants or Plaintiff had other Fort Dix officials in mind.

Plaintiff's third and fourth claims relate to his SHU
confinement in connection with the second investigation.  On the
one hand, Plaintiff asserts that his rights were violated
because he was housed in a cell that had no heating; on the
other hand, he asserts that his rights were violated because he
had to triple-cell.  Neither one of these claims is viable.

Plaintiff expressly asserts that the SHU cells during the
two-week period of his second SHU confinement were cold because
of the failure of the heating system at the SHU.  He also
expressly asserts that Fort Dix officials were indeed working
toward fixing that maintenance problem but, in spite of their
efforts, the problem could not have been resolved fast enough to
ensure that the SHU inmates, Plaintiff included, had their cells
properly heated.  Since Plaintiff concedes that Fort Dix
officials were continuously working toward fixing the heating
problem, they could not have been deliberately indifferent to
that problem.  Correspondingly, Plaintiff's allegations based on
the cold in the SHU cells are contradicted by his own factual
predicate and will be dismissed for failure to state a claim
upon which relief can be granted.

Plaintiff's triple-celling challenges fare no better.
Being housed in a cell with two other inmates, or having one's
mattress placed on the floor, is not a violation of one's Eighth
Amendment rights.

24

The Court of Appeals expressly stresed that inmates do not have a right to be free from being housed with other inmates. See Hubbard v. Taylor, 538 F.3d 229, 236 (3d Cir. 2008); see also North v. White, 152 F. App'x 111, 113 (3d Cir. 2005) (per curiam) (relying on Union Cty. Jail Inmates v. DiBuono, 713 F.2d 984, 1000 (3d Cir. 1983)); Gibase v. George W. Hill Corr. Facility, 2014 U.S. Dist. LEXIS 820862 (E.D. Pa. June 16, 2014) ("housing multiple inmates in a cell does not alone establish a constitutional violation").[15]  Also, the inmates have no right "to be free . . . from sleeping on a mattress placed on the floor."  Hubbard, 538 F.3d at 236.  Thus, Plaintiff's claims that he was housed in a SHU cell with two cell-mates and had his mattress (if he was given a mattress) placed on the floor for two weeks should be dismissed for failure to state a claim regardless of whether or not these allegations were raised against the named Defendants or Plaintiff had some other Fort Dix officials in mind.

That being said, a slight ambiguity in Plaintiff's language as to this latter claim warrants a further review.

---

[15]  Notably, the Court of Appeals' cases addressing challenges based on triple-celling were based on the claims of pre-trial detainees, which are governed by the due process analysis and entitled to *more* protection than the rights of convicted prisoners whose claims are governed by the Eighth Amendment.  In other words, if the rights of pre-trial detainees cannot be violated by triple-celling, the rights of convicted prisoners cannot, a fortiori, be offended by such conditions.

25

### 4.   Leave to Replead

As detailed supra, Plaintiff asserted that he was sleeping on a "bare floor" but simultaneously stated that he was sleeping only "without bedding." See this Opinion, note 6.  Thus, this Court cannot establish with a sufficient degree of certainty whether Plaintiff was sleeping, for two weeks, without *bed linens* or without the linens and a *mattress*.  See id.; see also, id., note 2 (Plaintiff's allegations are, unfortunately, heavily laden with resort to poetic license that obstructs clear understanding of his claims).

While the absence of bedding over a mattress for a period of two weeks cannot amount to a viable conditions of confinement claim under the test articulated in Sandin, see Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997) (six months of administrative segregation was not atypical compared with the general prison population, even though segregated inmates did not receive clean clothing, linen or bedding as often as required); an absence of a mattress might, potentially, amount to a viable claim in the event Plaintiff *literally* had to sleep on a bare floor without *any mattress and bedding* while his SHU cell was without heat.[16]

---

[16]   The law was not clearly established . . . with regards to mattress deprivation . . . .  We had held that mattress deprivation "for only one night was

26

Therefore, solely out of an abundance of caution, this
Court will grant Plaintiff the final – and narrowly-tailored –
leave to amend, so Plaintiff would have an opportunity to: (a)
clarify, without any resort to poetic license, whether he had to

---

insufficient to state an Eighth Amendment violation,"
Hernandez v. Denton, 861 F.2d 1421, 1424 (9th Cir.
1988), vacated on other grounds, 493 U.S. 801 (1989),
but had not made clear whether mattress deprivation for
longer could state an Eighth Amendment claim.  Although
we had indicated . . . that a prisoner who was "forced
to sleep on the floor, without a mattress, next to
broken toilets and overflowing showers" for an
unspecified period of time and "had to wear the same
clothes for 45 days" might have an Eighth Amendment
claim, Seagrave v. Hennessey, 1994 U.S. App. LEXIS
4321, at *4-6 (9th Cir. Mar. 2, 1994), we had also
explained that the Supreme Court's observation that "a
condition of confinement which does not violate the
Eighth Amendment when it exists for just a few days may
constitute a violation when it exists for 'weeks or
months,' did not provide clear guidance to prison
officials as to how much time must pass before
requiring a prisoner to sleep on the floor of a cell
without a mattress may constitute an Eighth Amendment
violation."  Schroeder v. Kaplan, 60 F.3d 834 (9th Cir.
1995) (quoting Hutto v. Finney, 437 U.S. 678, 686-87
(1978)).  We also held in Schroeder that, where a
prisoner was forced to sleep on a cold concrete floor
for most of a month, the law was not clearly
established on whether mattress deprivation was an
Eighth Amendment violation.  [See] 60 F.3d 834.  We
concluded that there was no binding precedent in our
circuit, that decisional law in other jurisdictions was
inconsistent, and that those courts that found a
constitutional violation had additional egregious facts
supporting an Eighth Amendment claim.  [See] 60 F.3d
834 (citing cases that included additional factors such
as "extreme cold, lack of sanitary conditions, solitary
confinement, inadequate clothing, or improper diet").

Chappell v. Mandeville, 706 F.3d 1052, 1060 (9th Cir. 2013).

27

sleep on a bare floor without any mattress and bedding during his two weeks stay in a cold SHU cell during his second SHU confinement; and (b) to name, as the defendant(s) in this matter, the particular Fort Dix officer(s) whom Plaintiff expressly asked for at least a mattress to be placed on the floor in light of the cold in Plaintiff's SHU cell and who expressly denied Plaintiff's request to as to the mattress.[17]

**IV.   <u>CONCLUSION</u>**

For the foregoing reasons, all allegations raised in Plaintiff's Complaint-III, short of his statement that he was forced to sleep on a "bare floor," will be dismissed with prejudice.  Plaintiff will be allowed an opportunity to clarify, in good faith and without any resort to poetic license, his claim that he was forced to sleep on a "bare floor."

An appropriate Order <u>follows</u>.


<u>s/Renée Marie Bumb</u>
**RENÉE MARIE BUMB**
**United States District Judge**


Dated:<u> November 21, 2014</u>

---

[17]   This Court stresses that Plaintiff's amended complaint shall *not* raise or recite any other claim, and Plaintiff's failure to reduce his challenges based on his alleged sleeping on "a bare floor" to simple, clear and unambiguous terms would be construed as Plaintiff's statement that he *was* provided with a mattress, and his claim will be dismissed accordingly.

28